IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**UNITED STATES OF AMERICA**

**v.**  CRIMINAL NO. 2:18-00107

**MICHAEL MATTHEW PHILLIPS**

## MEMORANDUM OPINION AND ORDER

Pending before the court is the defendant's motion for judgment of acquittal. (ECF No. 67). The government has responded to the motion. (ECF No. 70). For the reasons expressed below, that motion is **DENIED**.

### I. Background

After a jury trial, Michael Matthew Phillips ("Phillips" or "defendant") was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Phillips moved for a judgment of acquittal at the close of all the evidence and, after the verdict, filed the instant written motion. In his motion, Phillips argues that the evidence presented at trial was insufficient to sustain his conviction. Specifically, Phillips contends that the government's evidence fell short of establishing his constructive possession of the firearm at issue in this case.

### II. Standard of Review

In evaluating a defendant's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), the court must

view the evidence in the light most favorable to the government to determine if any rational trier of fact could have found the defendant guilty of the essential elements of the crime beyond a reasonable doubt. See United States v. Wilson, 118 F.3d 228, 234 (4th Cir. 1997). Accordingly, defendant's conviction must be sustained if, viewed in the light most favorable to the United States, there is substantial evidence to support it. See Glasser v. United States, 315 U.S. 60, 80 (1942). In reviewing the sufficiency of the evidence, a court does not weigh the evidence or assess the credibility of witnesses. United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983). The court "must assume that the jury resolved all contradictions in testimony in favor of the Government." United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1402 (4th Cir. 1993).

"'[S]ubstantial evidence,' in the context of a criminal action, [is] that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" United States v. Newsome, 322 F.3d 328, 333 (4th Cir. 2003) (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996)). "The jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994); see also United States v. Saunders, 886 F.2d 56, 60 (4th Cir. 1989)

2

("[T]his court is bound by the credibility choices of the jury.") (internal citations and quotations omitted). Furthermore, "if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." Murphy, 35 F.3d at 148. Therefore, a defendant challenging the sufficiency of the evidence "`must overcome a heavy burden.'" United States v. Palomino-Coronado, 805 F.3d 127, 130 (4th Cir. 2015) (quoting United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995)).

> The Court "may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable," United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996); instead reversal for insufficiency must "be confined to cases where the prosecution's failure is clear," Burks v. United States, 437 U.S. 1, 17, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

Id.

### III. Analysis

Where, as here, a defendant argues that a jury's verdict was based on insufficient evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). The indictment in this case charges that, on or about January 24, 2017, defendant did knowingly possess a firearm, a HI-Point, Model C9, 9mm pistol, after having been convicted of a crime punishable by a term of imprisonment exceeding one year. "To show a § 922(g)(1) violation, the government must prove three elements: (i) that

3

the defendant was a convicted felon at the time of the offense; (ii) that he voluntarily and intentionally possessed a firearm; and (iii) that the firearm traveled in interstate commerce at some point." United States v. Adams, 814 F.3d 178, 183 (4th Cir. 2016) (quoting United States v. Gallimore, 247 F.3d 134, 136 (4th Cir. 2001)). Phillips stipulated that he was a convicted felon and that the firearm at issue was manufactured in Ohio. See Government's Exhibit 1 (ECF No. 60-1). Therefore, the only disputed element was whether Phillips possessed the firearm at issue in this case.

Of the government's burden in proving possession, the United States Court of Appeals for the Fourth Circuit has explained:

> Under our possession jurisprudence, possession can be actual or constructive. United States v. Rusher, 966 F.2d 868, 878 (4th Cir. 1992). "Actual possession" is defined as "[p]hysical . . . control over property." Black's Law Dictionary 1201 (8th ed. 2004). Constructive possession is established if it is shown "that the defendant exercised, or had the power to exercise, dominion and control over the item." Rusher, 966 F.2d at 878.

United States v. Moye, 454 F.3d 390, 395 (4th Cir. 2006) (en banc). "Notably, dominion and control cannot be established by mere proximity to [ ] contraband, by mere presence on the property where the contraband is found, or by mere association with the person who does control the contraband." United States v. Blue, 808 F.3d 226, 232 (4th Cir. 2015); see also United States v. Pardo, 636 F.2d 535, 549 (D.C. Cir. 1980) ("There must

4

be some action, some word, or some conduct that links the individual to the [contraband] and indicates that he had some stake in them, some power over them. There must be something to prove that the individual was not merely an innocent bystander."). Furthermore, possession can be shared with others. United States v. Burgos, 94 F.3d 849, 873 (4th Cir. 1996); see also United States v. Jones, No. 17-4480, 742 F. App'x 710, 713 (4th Cir. July 18, 2018) ("Possession can be actual, exclusive, constructive, or joint."). "`Possession, whether actual or constructive, can be extremely brief: a minute of possession is as much an offense as a year of possession.'" Jones, 742 F. App'x at 713 (quoting United States v. Torres-Colon, 790 F.3d 26, 32 (1st Cir. 2015)).

The relevant facts adduced at trial are as follows. On January 18, 2017, Jeremy Hyer[*] stole the firearm named in the indictment from his uncle, James Monk. Trial Testimony of Jeremy Hyer, September 12, 2018, at 4-6 (hereinafter "Hyer Test. at ___") (ECF No. 67-1). Hyer, a self-described drug addict, testified that he stole the firearm in order to trade it for heroin. See id. at 5. According to Hyer, he traded the gun and some stolen coins with "K" for one gram of heroin. See id. at 35. After being "caught" by the Kanawha County Sheriff's

---

[*] At various times in the record, Hyer's last name is spelled "Hyre". The court uses "Hyer" herein.

Department, Hyer admitted to having stolen the gun and agreed to "[g]et the gun back." See id. at 5. On cross-examination, Hyer also conceded that he thought getting the gun back would help him avoid being charged with the theft of the gun. See id. at 36.

To that end, on January 24, 2017, the Kanawha County Sheriff's Department provided Hyer with money to purchase the gun back in a controlled buy. See id. at 6. Hyer was also given money to purchase heroin. See id. According to Hyer, law enforcement equipped him with a camera in order to videotape the transaction. See id. at 8-10. Hyer testified that he contacted "K" to get the gun back. See id. at 7.

Hyer and "K" exchanged text messages and Hyer got a message from "K" to go to Go Mart. See id. at 38-40; see also Defendant's Exhibits 1 and 2 (ECF Nos. 60-5 and 60-6). Hyer testified that he believed that he had talked to "K" prior to exchange of the text messages. See id. at 39. The following text messages were exchanged between Hyer and "K":

> Hyer: She had to go to bank I'm tryin to hurry her ass up lol
>
> K: Ok I'm back here
>
> Hyer: Fast as I can bro I'm comin tho for sure
>
> K: K
>
> Hyer: Pulling out the bank nigga
>
> K: There's cops every were [sic] go to go-mart

Hyer: I b there in 5ish I got 175 bra

Defendant's Exhibits 1 and 2.

After meeting with law enforcement, Hyer went to the Go Mart in North Charleston "[t]o try to get - - retrieve the gun." Hyer Test. at 9. In doing so, Hyer testified that "I thought I was meeting one of K's friends." Id. Eventually, Hyer encountered defendant at the Go Mart. See id. at 9, 12.

After meeting up at the Go Mart, Hyer and Phillips left the Go Mart together and went to a house "across the street." Id. at 10. Hyer testified that he did not know "whose house" it was and that he left the money in the house "to get the weapon back." Id. at 10, 20. There was some discussion regarding money on the recording. A short time later, both Hyer and Phillips left the house and went to the "end of the street." Id. at 18. The videorecording of the incident shows Phillips pointing in the video. See id. at 17. Shortly thereafter, Hyer retrieved the gun from some weeds. See id. at 18, 20.

Of his retrieval of the gun, Hyer testified:

> Q: Now, at that point, did you retrieve the gun?
>
> A: I believe so.
>
> Q: Well, you retrieved a gun that afternoon, did you not?
>
> A: Yes.
>
> Q: And was it that location that you retrieved the gun?

7

A: Yes. I'm pretty sure.

Q: Before you got that gun, tell us what you knew about the location of it on that date.

A: That's - - that's all I knew.

Q: What do you mean that's all you knew?

A: I didn't know the location of it.

Q: And how did you learn the location of the gun?

A: Someone told me at some point.

Q: And who was that someone?

A: I don't - - I can't recall a hundred percent.

Q: Well, who led you to that place?

A: We just walked together. He didn't really lead me.

Q: Could you have found that gun without Matt?

A: I'm not sure. I don't know. Probably not, but I can't say a hundred percent.

Q: Mr. Hyre, did you place that gun there that afternoon?

A: Did I?

Q: Yes.

A: I don't believe so.

Q: Well, did you, or didn't you?

A: No.

Q: Prior to meeting Matt, did you know where that gun was?

A: Not exactly, no.

8

```
            Q:   Well, had anybody else told you?

            A:   I don't - - I don't believe so. I don't - -
                 I don't recall.
```

Id. at 18-19.

Hyer was a reluctant witness for the government.

```
            Q:   You don't want to be here testifying today,
                 do you?

            A:   No, I don't.

            Q:   Why?

            A:   I - - I just don't.

            Q:   Well, is there a particular reason?

            A:   No. I just want to go home.
```

Id. at 19-20.

Hyer also testified that he was troubled by the idea of implicating "K".

```
            Q:   Is it fair to say you didn't like the idea of
                 setting K up to send him to jail?

            A:   Yeah. No, I didn't.

            Q:   Because you agree there would be a lot of
                 negatives to that, such as, you would lose a
                 source of heroin if he went to jail?

            A:   I had - - I had a few sources but, yeah, that
                 was - -

            Q:   But you would lose him if he went to jail,
                 right?

            A:   Right.

            Q:   And you also risked getting labeled as a
                 snitch on the streets, correct?
```

A:    Right.

           Q:    And, if you're labeled as a snitch, people
                 might not sell drugs to you?

           A:    Right.

Id. at 36-37. Hyer testified that he was unsure of the exact nature of defendant's relationship with "K" although he stated that he was "[s]omewhat" sure there was one because he had "seen" both "K" and "Matt . . . around." Id. at 7.

Viewing the evidence in the light most favorable to the government, the court finds there was sufficient circumstantial evidence to support the jury's verdict that, on January 24, 2017, Phillips constructively possessed the firearm at issue in this case. Hyer was certainly a reluctant witness. But, on certain points, his testimony was clear. Hyer testified that he stole the firearm from his uncle and then traded it for heroin. A week or so later, Hyer admits to the Kanawha County Sheriff's Department that he had stolen the gun. Believing it in his best interest to do so, Hyer agrees to work with law enforcement to recover the gun. Hyer's testimony on these points was corroborated by Corporal Jeremy Hatfield who also testified at the trial.

Hyer communicates with "K" to see about buying back the gun. Although Hyer's testimony on this point was somewhat cagey, screenshots confirm the communication and the agreement. See Defendant's Exhibits 1 and 2 (ECF Nos. 60-5 and 60-6).

Whereupon, the Kanawha County Sheriff's Office arranged for Hyer to purchase the firearm in a controlled buy.

Although the text messages setting up the transaction were between Hyer and "K", Phillips, not "K", is the person who shows up at the Go Mart. Furthermore, Hyer leaves the Go Mart with Phillips. This is certainly circumstantial evidence from which a reasonable jury could infer that Phillips was the person who Hyer planned to meet.

Hyer and Phillips then walk to a house. Hyer leaves the money for the weapon at that house. Afterwards, Hyer and defendant walk to a lot where defendant is shown pointing. See Government's Exhibit 3. Shortly thereafter, Hyer retrieves the weapon from the weeds. Most of this can be seen on the videorecording that was shown at trial.

With respect to defendant's argument that he was merely a fall guy for Hyer, there is nothing to suggest that Hyer needed a fall guy. Indeed, Hyer admitted to stealing the gun. According to him, he thought that he would get off easier if he helped recover the gun. If, on January 23, 2017, Hyer had possession of the gun, actual or constructive, he could simply have retrieved the gun. Therefore, it is reasonable to infer that Hyer did not know where the gun was until Phillips showed him. Indeed, he testifies as much:

    Q:    Could you have found that gun without Matt?

>     A:   I'm not sure.  I don't know.  Probably not,
>          but I can't say a hundred percent.
>
>     Q:   Mr. Hyre, did you place that gun there that
>          afternoon?
>
>     A:   Did I?
>
>     Q:   Yes.
>
>     A:   I don't believe so.
>
>     Q:   Well, did you, or didn't you?
>
>     A:   No.
>
>     Q:   Prior to meeting Matt, did you know where
>          that gun was?
>
>     A:   Not exactly, no.
>
>     Q:   Well, had anybody else told you?
>
>     A:   I don't - - I don't believe so.  I don't - -
>          I don't recall.

Hyer Test. at 18-19.

Phillips argues that the government failed to prove his constructive possession of the firearm because there was no evidence that Hyer gave the buy money to him or that he had any ownership interest or lived in the house where Hyer "dropped" the money. However, this point is immaterial to whether Phillips is guilty of being a felon in possession of a firearm. The government was not required to prove that any money changed hands.

Defendant also argues that his mere presence in proximity to the gun was insufficient to prove his constructive possession of

the weapon. However, the government did not soley rely on Phillips' proximity to the gun but, instead, showed that defendant exercised dominion and control over the firearm. The government's evidence on this point was shown by Hyer's testimony that he could not find the firearm without Phillips' assistance. The evidence was sufficient to prove defendant's constructive possession of the firearm. See, e.g., United States v. Clark, 48No. 01-4839, F. App'x 57, 61 (4th Cir. 2002), ("The Government's evidence that Clark knew the location of the weapons prior to the search is sufficient to establish constructive possession of the weapons.").

Nor was the government required to prove that Phillips was the one who placed the gun by the utility pole or that he maintained exclusive control over the gun. As noted above, possession may be joint and it may be brief. See United States v. Escobar-de Jesus, 187 F.3d 148, 176 (1st Cir. 1999) ("[D]uration of possession is not an element of the statute.").

Finally, the court finds no merit in defendant's argument that his Rule 29 motion must be granted because of the government's alleged failure to prove an agency or conspiratorial relationship between "K" and Phillips. The government was not required to prove the exact nature of the relationship between defendant and "K" or that one existed at all. As discussed above, the evidence showed that Hyer arranged the recovery of the

gun with "K". "K" did not show up; Phillips did. And Phillips was with Hyer when the weapon was recovered. It was certainly reasonable for the jury to infer that either Phillips was actually "K" or that Phillips constructively possessed the firearm in combination with "K".

The court is mindful that a jury <u>could</u> have concluded that Phillips was not in possession of the firearm but was merely present when the firearm was recovered. "However, it was for the jury, not this court, to decide which version of the events—the government's or [defendant]'s—was more credible." <u>United States v. Moye</u>, 454 F.3d 390, 396 (4th Cir. 2006) (en banc). As the Fourth Circuit explained:

> To be sure, as appellate judges, we enjoy no greater vantage point on appeal than did the jury at trial and we have no right to usurp the jury's role to find facts. . . . If we did otherwise, we would be substituting our judgment for that of the jury. In this case, the jury was entitled to reach the reasonable and quite unremarkable conclusion that [defendant] possessed the firearms. . . ."

<u>Id.</u> at 396-97.

## IV. Conclusion

For the foregoing reasons, defendant's motion for judgment of acquittal is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, to the United States Marshal for the Southern District of West Virginia, and to the Probation Office of this court.

IT IS SO ORDERED this 28th day of February, 2019.

    ENTER:

    David A. Faber
    Senior United States District Judge